**NOT FOR PUBLICATION**                                           **CLOSED**


# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

_____
                                        :
DENNIS RIORDAN,                         :
                                        :
                    Plaintiff,          :            Civil Action No. 05-5114
                                        :
        v.                              :            **OPINION**
                                        :
COMMISSIONER OF SOCIAL                  :
SECURITY,                               :
                                        :
                    Defendant.          :
_____:

APPEARANCES:

Abraham S. Alter
Langton & Alter
P.O. Box 1798
2096 St. Georges Avenue
Rahway, NJ 07065
        Attorney for Plaintiff

Christopher J. Christie
United States Attorney
Karen G. Fiszer
Special Assistant U.S. Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278
        Attorneys for Defendant

PISANO, District Judge:

Before the Court is the appeal of Dennis Riordan ("Riordan") from the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his request for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits. The Court has jurisdiction to review this matter under 42 U.S.C. §§ 405(g) and 1383(c)(3) and decides this matter without oral argument. *See* Fed. R. Civ. P. 78. The record provides substantial evidence supporting the Administrative Law Judge's ("ALJ") decision that Riordan retained the residual functional capacity to perform his past relevant work and thus was not under a disability as defined in the Social Security Act. Accordingly, the Court affirms the Commissioner's decision.

## I.  BACKGROUND

Riordan was born on September 19, 1953. He has a twelfth-grade education. At the time of the hearing before the ALJ, Riordan was six feet tall and weighed about 400 pounds. He worked for 20 years at a brokerage firm, most recently as an operations specialist. He has not worked since November 1991, the date on which he asserts he became disabled.

### A.  Procedural History

Riordan filed applications for benefits on June 30, 2003, alleging that he became disabled on November 16, 1991 due to obesity, lower back and leg pain, sleep apnea, kidney problems, hypertension, and psoriasis. The Social Security Administration denied Riordan's claim both initially and upon reconsideration. Upon Riordan's request, a hearing was held before ALJ Richard L. De Steno on March 8, 2005, during which Riordan and his wife appeared to provide

testimony.  On April 5, 2005, ALJ De Steno issued a written decision denying Riordan's claim. A request for review by the Appeals Council was denied on August 22, 2005, making the ALJ's decision the Commissioner's final decision on the issue of Riordan's request for benefits.  He is only insured for DIB through December 31, 1996, though his SSI claims are still reviewable through present.[1]

### B. Factual History

#### 1. Riordan's previous employment

Riordan's past relevant work history includes his 20 years as an operations specialist for a brokerage house.  (Administrative Record ("R.") at 66.)  He testified at the hearing before the ALJ regarding his job (R. at 274-78), explaining that while working in either the balancing area or the cashier's department, he mostly sat and worked in bookkeeping, using a calculator and a computer.  His job required speed and accuracy.  He stood or walked about two hours per day, helping people in other departments with any balancing errors they had made.  In his disability report, Riordan indicated that his job required no heavy lifting.  (R. at 61.)  He testified that he stopped working in 1991 after his company called to tell him not to come back.  (R. at 278.)

#### 2. Riordan's daily activities

According to his testimony at the hearing, Riordan lived in a house with his wife and two children aged 22 and 24.  (R. at 284.)  During the day, while his wife and children were working or at school, Riordan stated that he mostly would lie in his bedroom and watch TV with his feet up.  (R. at 287-88.)  He testified that he did no household chores, but that he could make himself

---

[1]  The Court notes, however, that if Riordan were eligible for benefits, he could only be paid SSI benefits as of July 2003, the month after the month in which he filed his SSI application (R. at 252-54).  *See* 20 C.F.R. § 416.335.

a sandwich.  (R. at 288.)  According to a questionnaire Riordan filled out regarding his daily activities, he would also occasionally take out the garbage and balance the checking account, and on a typical day of warm weather he would turn the sprinklers on to water the grass, turn on the filter to the swimming pool, and test the water, while in cold weather he would do very little.  (R. at 82-83.)  Riordan testified that he had not driven since a year and a half before the hearing, when he was in an accident, and has since attended family functions infrequently.  (R. at 288.)  Beforehand, however, on weekends the family would usually visit friends and relatives.  (R. at 83.)

### 3.  Riordan's medical history

Riordan's medical records show that he was hospitalized at St. Mary Hospital in Hoboken, New Jersey, on December 12, 1990 for three days complaining of chest pain.  (R. at 106-07.)  Upon examination by Dr. R. Hermann, no acute ischemic changes were found, and he was discharged home in good stable clinical condition.  (*Id.*)  He worked three months over the course of the following year.  (R. at 277-78.)  He was hospitalized again at St. Mary Hospital on June 12, 1991 for six days due to chest pain.  (R. at 123-46.)  Examinations by Dr. Hermann showed a normal heart size and no evidence of myocardial ischemia.  He was six feet tall and weighed 350 pounds.  In November 1991, his company called him and told him not to return to work (R. at 278.), which Riordan attributes to his inability to perform his job (R. at 60).

On January 30, 1995, family physician Dr. Leonard M. Balacco reported that Riordan weighed 360 pounds and had psoriatic lesions on his legs and arm.  (R. at 149.)  Psoriasis continued through 1999, as reported by Riordan's dermatologist, Dr. Alfredo Fernandez-Obregon.  (R. at 172.)  In December of 1999, Riordan developed cellulitis in his legs, for which

4

he was hospitalized at St. Mary Hospital for six days.  (R. at 173-89.)  Records indicate that was treated effectively, discharged, and Dr. Angelo DeMarco prescribed antibiotics and creams, as well as Tylenol for discomfort, and an 1800 calorie diet.  (*Id.*)  His short- and long-term prognosis was good.  (R. at 176.)  Riordan's cellulitis was noted again in 2002 by his family physician Dr. Jerry Jurado (R. at 191-99) and in 2003 during a visit to St. Mary Hospital for diarrhea (R. at 207).

In the last half of 2002, Riordan went through a series of tests to examine the health of his heart.  On July 26, 2002, at the request of Dr. Jurado, he had an electrocardiogram ("EKG") at Meadowlands Hospital which turned out to be abnormal (R. at 201), but Riordan had no complaints of chest pain or shortness of breath a month later on a visit to Dr. Jurado on August 23, 2002 (R. at 194).  Another EKG requested by Dr. Jurado on November 26, 2006 was performed by Dr. Feraydoon Kohan of the Heart Center of New Jersey and, while also abnormal, showed normal left ventricle chamber size with well-preserved left ventricle systolic function, while the right atrium and ventricle also appeared normal in size and contractibility.  (R. at 202.)  Finally, a December 10, 2002 myocardial perfusion study performed by Dr. Lionel Zuckier of the University of Medicine and Dentistry of New Jersey was normal and demonstrated left ventricle ejection fraction of 58% with excellent wall motion.  (R. at 204.)

Regarding his kidney function, on May 12, 2003, a renal angiogram was performed on Riordan by Dr. Richard Pinto of Hudson MRI and pointed to questionable stenosis at the origin of the left renal artery.  (R. at 213.)  A subsequent captopril renogram study performed by Dr. Orestes Sanchez of Bergenline X-Ray Diagnostic Center on June 7, 2003 showed no evidence of underlying renal stenosis, with a normal renal upstroke and a decreased function of the left

kidney of approximately 30% as compared to the right.  (R. at 214.)

Riordan was diagnosed by Dr. Alfredo Festa with sleep apnea on February 24, 2003.  (R. at 212.)  Dr. Festa recommended that Riordan lose weight and stated that surgery might be a possibility in the future.  Dr. Festa noted that medical treatment was prescribed and advised Riordan to return if there was no improvement in his symptoms.  On May 21, 2004, the St. Francis Hospital Sleep Study Center reported that Riordan responded well to Continuous Positive Airway Pressure ("CPAP") sleep therapy.  (R. at 250.)

At the hearing before the ALJ, Riordan testified to the following.  (R. at 274-95.)  He has problems standing and walking due to the pain in his legs.  The pain in his legs comes from the psoriasis and the swelling which accompany any standing or walking.  The swelling and pain occur after standing for ten minutes.  He testified that he could stand no more than 30 minutes over the course of an eight-hour day, and that after standing, he has to elevate his legs to alleviate the pain and swelling.  Sitting with his feet on the floor exerts similar pressure on his legs, and he can do so for no more than 10-15 minutes without pain.  Though he acknowledges walking at a normal gait, Riordan explained that he walks slowly and after about two blocks the pain becomes too severe.  He cannot bend over and lift any substantial weight; he testified, however, that he could lift and carry a gallon of water, though doing so repeatedly would bother his back and legs.  He was never told if anything is wrong with his back because, he said, he is too large for an MRI or CAT scan machine.  Riordan also has problems with shortness of breath and overall stamina.

In two medical opinions on which the ALJ relied heavily, reports from treating physician Heather R. Lefkowitz M.D. and examining physician Michael Pollack M.D. stated that Riordan was in "no apparent distress" (R. at 216) and "no acute distress" (R. at 218).  On December 22,

6

1999 (R. at 170-71), Dr. Lefkowitz found Riordan to have a normal physical examination except for a cellulitic rash on his left leg and psoriatic plaques on his elbows and legs.  She determined that he was obese but that he was in no apparent distress and felt well, slept fine, and had good energy.  She concluded that, secondary to mild proteinuria and mildly impaired creatinine clearance, he would have no functional impairment.  On August 29, 2003 (R. at 216), Dr. Lefkowitz again examined Riordan, finding that he had minimal proteinuria and good creatinine clearance, with very mild renal insufficiency and very mild hypertension.  She noted his morbid obesity probably limited him in his exercise ability but that overall, he was in no apparent distress, with good breath sounds and a regular rate and rhythm in his heart.  On September 11, 2003 (R. at 217-19), Dr. Pollack found that Riordan walked with a normal gait, and that he moved about and could ambulate without difficulty.  In general, Dr. Pollack reported that Riordan appeared on physical examination to be well developed, well nourished, and in no acute distress.

## II.  STANDARD OF REVIEW

A reviewing court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence."  42 U.S.C. § 405(g); § 1383(c)(3) ("The final determination of the Commissioner . . . shall be subject to judicial review as provided in section 405(g) . . . ."); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992).  "Substantial evidence" means more than "a mere scintilla."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 220 (1938)).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*  The inquiry is not

whether the reviewing court would have made the same determination, but rather whether the Commissioner's conclusion was reasonable. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Thus, substantial evidence may be slightly less than a preponderance. *Stunkard v. Sec'y of Health & Human Servs.*, 841 F.2d 57, 59 (3d Cir. 1988).

> Some types of evidence will not be "substantial." For example,
>
> '[a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence - particularly certain types of evidence (e.g. that offered by treating physicians) - or if it really constitutes not evidence but mere conclusion.'

*Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).

The reviewing court must review the evidence in its totality. *See Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984). In doing so, "a court must 'take into account whatever in the record fairly detracts from its weight.'" *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting *Willibanks v. Sec'y of Health & Human Servs.*, 847 F.2d 301, 303 (6th Cir. 1988) (internal citation omitted)). The Commissioner has a corresponding duty to facilitate the court's review: "Where the [Commissioner] is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence." *Ogden v. Bowen*, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing *Brewster v. Heckler*, 786 F.2d 581 (3d Cir. 1986)). As the Third Circuit has held, access to the Commissioner's reasoning is indeed essential to meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the

8

court's duty to scrutinize the record as a whole to determine whether the
conclusions reached are rational.

*Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978) (quoting *Arnold v. Sec'y of Health, Educ.*

*& Welfare*, 567 F.2d 258, 259 (4th Cir. 1977)).  Nonetheless, the district court is not "empowered

to weigh the evidence or substitute its conclusions for those of the fact-finder."  *Williams*, 970

F.2d at 1182.

### A.  The Record Must Provide Objective Medical Evidence

Under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq.* and 42 U.S.C.

§ 1381 *et seq.*, a claimant is required to provide objective medical evidence in order to prove his

disability.  42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a

disability unless he furnishes such medical and other evidence of the existence thereof as the

Commissioner of Social Security may require."); 42 U.S.C. § 1382c(H)(i) ("In making

determinations with respect to disability under this subchapter, the provisions of section[] . . .

423(d)(5) of this title shall apply in the same manner as they apply to determinations of disability

under subchapter II of this chapter.").  Accordingly, a plaintiff cannot prove that he is disabled

based solely on his subjective complaints of pain and other symptoms.  *See Green v. Schweiker*,

749 F.2d 1066, 1069-70 (3d Cir. 1984) ("[S]ubjective complaints of pain, without more, do not

in themselves *constitute* disability.").  He must provide medical findings that show that he has a

medically determinable impairment.  *See id.*; *see also* 42 U.S.C. § 423(d)(1)(A) (defining

"disability" as an "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment"); 42 U.S.C. § 1382c(a)(3)(A) (defining a

disabled person as one who is "unable to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment").

Furthermore, a claimant's symptoms, "such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect [one's] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. § 404.1529(b); *see Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) (rejecting claimant's argument that the ALJ failed to consider his subjective symptoms when the ALJ had made findings that his subjective symptoms were inconsistent with objective medical evidence and the claimant's hearing testimony); *Williams*, 970 F.2d at 1186 (denying claimant benefits where claimant failed to proffer medical findings or signs that he was unable to work).

## B.  The Five-Step Analysis for Determining Disability

In order to be eligible for DIB and/or SSI benefits, a claimant must demonstrate that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  Furthermore, a claimant must also show that the impairment or impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

Social Security regulations provide a five-step, sequential evaluation procedure to determine whether a claimant is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920.[2]  For the first

---

[2]  The regulations implementing the standard for obtaining disability insurance benefits, 42 U.S.C. § 401 *et seq.*, and those implementing the standard for supplemental security income benefits, 42 U.S.C. § 1381 *et seq.*, are the same in all relevant aspects. *Sullivan v. Zebley*, 493

two steps, the claimant must establish (1) that he has not engaged in "substantial gainful activity" since the onset of his alleged disability, and (2) that he suffers from a "severe impairment" or "combination of impairments."  20 C.F.R. §§ 404.1520(b)-(c), 416.920(b)-(c). Given that a claimant bears the burden of establishing these first two requirements, the failure to meet this burden automatically results in a denial of benefits.  *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

If the claimant satisfies his initial burdens, the third step requires that he provide evidence that his impairment is equal to or exceeds one of those impairments listed in Appendix 1 of the regulations ("Listing of Impairments").  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  Upon such a showing, the claimant is presumed to be disabled and is automatically entitled to disability benefits.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant cannot so demonstrate, the benefit eligibility analysis proceeds to steps four and five.

The fourth step of the analysis focuses on whether the claimant's "residual functional capacity" sufficiently permits him to resume his previous employment.  *See* 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).  "Residual functional capacity" is defined as the most a claimant can do despite any limitations caused by his or her impairments.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  If the claimant is found to be capable of returning to his previous line of work, then he is not "disabled" and not entitled to disability benefits.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Should the claimant be unable to return to his previous work, the analysis proceeds to step five.  At step five, the burden shifts to the Commissioner to demonstrate that the claimant can perform other substantial gainful work in the national economy, considering the claimant's

---

U.S. 521, 526 n.3 (1990).

residual functional capacity, age, education, and work experience.  *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).  If the Commissioner cannot satisfy this burden, the claimant shall receive social security benefits.  *Yuckert*, 482 U.S. at 146 n.5.

### III.  THE ALJ'S DECISION

After reviewing all of the evidence of record, the ALJ concluded that Riordan was not disabled within the meaning of the Social Security Act.  During his five-step analysis, the ALJ found that Riordan had not engaged in substantial gainful activity since the alleged onset of his disability, and therefore step one was satisfied.  He also found that the medical evidence indicated that Riordan had hypertension, coronary artery disease, obesity, sleep apnea, and cellulitis, and these impairments were "severe" within the meaning of the regulations, satisfying step two of the analysis.  The ALJ found that Riordan's impairments were not, however, of such severity that they met or medically equaled, either singly or in combination, any of the impairments listed in the Listing of Impairments.

Progressing to step four, the ALJ found that Riordan retained a residual functional capacity ("RFC") to perform his past relevant work.  The ALJ concluded that Riordan, despite his impairments, was capable of "lifting and carrying objects weighing up to 10 pounds; sitting up to six hours, and standing and walking up to two hours in an eight-hour day; and the full range of sedentary work."  (R. at 21.)  Referring to Riordan's testimony, the ALJ noted that his past relevant work was a job that required speed and accuracy, and which consisted of mostly sitting while working in bookkeeping, using a calculator and a computer, and standing or walking about two hours a day.  Based upon the ALJ's determination of Riordan's RFC, he found that Riordan

was still capable of performing his past relevant work.  Because the ALJ found that Riordan had

the RFC to perform his past relevant work, Riordan was not disabled as defined in the Social

Security Act.  *See* 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).  Therefore, there was no need to

proceed further in the five-step analysis.


## IV.  LEGAL DISCUSSION

Riordan challenges the ALJ's decision primarily on three grounds: (1) the ALJ did not

articulate a basis for his finding at the third step of the sequential evaluation, (2) the ALJ did not

consider Riordan's obesity in his evaluation at the third step, and (3) the ALJ did not articulate an

evidentiary basis for his RFC determination.  The Commissioner contends that the ALJ's

decision is supported by substantial evidence and therefore should be affirmed.

### A.  <u>The ALJ's Finding that Riordan's Impairments Did Not Match or Medically Equal a Listed Impairment</u>

Riordan argues that the ALJ failed to articulate his basis for finding that Riordan's

impairments did not meet or medically equal any of the impairments listed in the Listing of

Impairments at the third step of the sequential analysis. He bases this challenge upon the holdings

of the Third Circuit in *Cotter v. Harris*, 642 F.2d 700 (3d Cir. 1981), and *Burnett v.*

*Commissioner of Social Security*, 220 F.3d 112 (3d Cir. 2000).  Upon review, this argument is

without merit.

First, the Court notes that it is the plaintiff's burden to provide evidence demonstrating

that his impairments were of sufficient severity to meet or equal an impairment in the Listing of

Impairments.  *See Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000) (citing *Yuckert*, 482 U.S.

13

at 146 n.5).  Indeed, *Burnett* also recognizes that "the burden is on the claimant to present medical findings that show his or her impairment matches a listing or is equal in severity to a listed impairment."  220 F.3d at 120 n.2.

To show that his impairment met a listed impairment, Riordan had to present medical evidence demonstrating an impairment or impairments that matched every part of a specific listed impairment.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.") With respect to the listings for a heart condition, Riordan acknowledges that "it is a given that plaintiff doesn't meet any of the heart listings, but he meets parts of some of them."  (Plaintiff's Brief 13.) As such, Riordan cannot meet any of the listings for a heart condition.

Riordan, however, proposes that his combined impairments might medically equal a listed heart impairment.  To show that "his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment."  *Sullivan*, 493 U.S. at 531.  The ALJ found that Riordan's conditions did not equal in severity the relevant Listings 4.02 (Chronic Heart Failure), 4.03 (Hypertensive Cardiovascular Disease), and 4.04 (Ishemic Heart Disease), noting that 4.02, 4.03 and 4.04 "are not met because there is no evidence of chronic heart failure or impaired myocardial function" and that his hypertension did not rise to the "level" of hypertensive cardiovascular disease.  (R. at 19-20.)

Indeed, there is substantial evidence to support the ALJ's findings regarding these Listings.  As stated above, Riordan's heart was neither enlarged, nor was there any abnormal wall

motion or left ventricular ejection fraction of 30% or less, as required by Listing 4.02 Chronic

Heart Failure in the Listing of Impairments.  *See* 20 C.F.R. pt. 404, subpt. P, § 4.02.  There is no

evidence of impaired myocardial function nor of any acute ischemic changes that are required to

satisfy 4.04 Ischemic Heart Disease.  *See id.*, § 4.04.  Furthermore, Riordan's hypertension was

found to be "very mild" and "well controlled" by medication by Dr. Lefkowitz (R. at 216), and

thus in combination with the ALJ's other findings did not rise to the level required by Listing

4.03 Hypertensive Cardiovascular Disease.  *See* 20 C.F.R. pt. 404, subpt. P, § 4.03.  Finally,

although Riordan rebukes the ALJ for also evaluating his condition under Listings 2.02 through

2.04 and 11.04A and 11.04B, claiming it to be a "completely irrelevant analysis" (Pl.'s Br. 13),

Listing 4.03 instructs adjudicators to evaluate hypertensive cardiovascular disease under the

criteria for these listings as well.  *See id.*, § 4.03.  Thus, the ALJ properly evaluated all of the

body systems which may have been affected by Riordan's cardiac condition.

Riordan also asserts that the ALJ did not articulate a basis for his finding that his kidney

problems were not of a severe enough nature to meet or medically equal Listing 6.02

(Impairment of Renal Function).  However, the ALJ summarized the medical evidence and such

evidence simply does not support a finding that Riordan met this listing.  This listing requires

either chronic hemodialysis or peritoneal dialysis necessitated by irreversible renal failure, a

kidney transplant, or a persistent elevation of serum creatinine to 4 mg per deciliter or greater or

a reduction of creatinine clearance to 20 ml per minute or less, over at least three months, with a

specific accompanying condition, such as persistent anorexia.  20 C.F.R. pt. 404, subpt. P, § 6.02.

As the ALJ presented in his review of the medical evidence (R. at 18, 20-21), there is no

evidence suggesting that Riordan required either hemodialysis, peritoneal dialysis, or a kidney

transplant.

Indeed, there is further evidence to support the ALJ's finding.  Dr. Lefkowitz, a nephrology specialist, stated that while Riordan had once had "mildly impaired creatinine clearance" (of 59 ml per minute, well over the amount required by the listing), with no functional impairment (R. at 170-71), upon her last examination Riordan had "good creatinine clearance" (of 167 ml per minute) and a serum creatinine level of 1.0, and she concluded that any renal insufficiency he had was "very mild" (R. at 216).  The ALJ, after presenting and evaluating these findings by Dr. Lefkowitz (R. at 20), announced in his decision that he gave "[g]reat weight . . . to the detailed report[] of treating physician Lefkowitz.." (R. at 21.)  Consequently, not only did the ALJ further explain the basis for his finding, but the substantial evidence supports his findings.

The ALJ also sufficiently explained his basis for finding that Riordan's cellulitis[3] and psoriasis did not meet or medically equal any of the skin-related impairments in the Listing of Impairments.  He noted that because there was no evidence submitted by Riordan that his hands or feet were affected, which imposed a marked limitation of function, or that his lesions did not respond to prescribed treatment, then his impairments were not of the severity of the impairments in section 8.00 of the Listing of Impairments.  (R. at 20.)  Riordan did not challenge these findings.  (Pl.'s Br. 11-17.)

Finally, Riordan admits that he "doesn't argue that he meets any specific Listing."  (Pl.'s

---

[3]  Riordan appears to assume in that because the ALJ determined that Riordan's cellulitis and sleep apnea developed after his date last insured (R. at 19), the ALJ failed to consider either condition in his evaluation. (Pl.'s Br. 13-14.)  However, the ALJ clearly considered both conditions.  (R. 17-21).  Because Riordan concurrently filed an application for SSI benefits, the ALJ's review was not limited to reviewing only the period of DIB eligibility.

Br. 14.)  Rather, he argues that "his medical condition approximates a number of Listings, the combined effect of which disables him because all of his diseases leave him with the function of one who suffers Listing level disease."  (*Id.*)  The Supreme Court, however, has expressly invalidated this argument: "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment."  *Sullivan*, 493 U.S. at 531.  Therefore, even if he could show that the functional impact of his impairments is as severe as that of a listed impairment, that alone would not establish that he is disabled under the Act and entitled to benefits.

### B.  The ALJ's Consideration of Riordan's Obesity

The thrust of Riordan's argument is his challenge to the ALJ's evaluation of his obesity. Specifically, he asserts that the ALJ failed to provide an adequate evaluation as required by the Social Security Ruling ("SSR") 02-1p, Titles II and XVI: Evaluation of Obesity, 67 Fed. Reg. 57,859 (2002).[4]  This argument fails because the ALJ adequately considered Riordan's obesity in his decision.

In evaluating Riordan's obesity, the ALJ first noted that there is no specific listing for obesity in the Listing of Impairments.  (R. at 20.)  There are, however, references to special

---

[4]  The Court notes that Riordan relies on Social Security Ruling ("SSR") 00-3p, Titles II and XVI: Evaluation of Obesity, 65 Fed. Reg 31,039 (2000), which has in fact been superseded by SSR 02-1p, Titles II and XVI: Evaluation of Obesity, 67 Fed. Reg. 57,859 (2002). Nevertheless, the Rulings are substantively similar, *see Rutherford v. Barnhart*, 399 F.3d 546, 552 n.4 (3d Cir. 2005), and the Court undertakes to address the arguments elicited by Riordan's references to SSR 00-3p within the construct of the SSA's current policy on obesity, as set forth in SSR 02-1p.

consideration of obesity in sections 1.00Q, 3.00I, and 4.00F,[5] which the ALJ considered in his

evaluation of Riordan's obesity.  (R. at 20.)  The ALJ then correctly cited SSR 02-1p, which

advises:

> [W]e will not make assumptions about the severity or functional effects of obesity
> combined with other impairments. Obesity in combination with another impairment may
> or may not increase the severity or functional limitations of the other impairment. We will
> evaluate each case based on the information in the case record.

SSR 02-1p, 67 Fed. Reg. at 57, 862.  After having already gone through the information in the

case record within his decision, the ALJ concluded that Riordan's obesity did not affect his

impairments enough to raise them to the level of severity required by the regulations.  (R. at 20.)

Accordingly, the ALJ concluded that although Riordan's obesity was severe (R. at 19), it was

neither severe enough to meet or medically equal a listed impairment, nor did it affect any other

disorders to the point that they would be considered to have met or medically equaled a listed

impairment (R. at 19-20).

Furthermore, there is substantial evidence to support the ALJ's conclusions regarding

Riordan's obesity.  Dr. Lefkowitz concluded in 2003: "On physical examination, it is most

notable for morbid obesity. He appears in no apparent distress."  (R. at 216.)  In 1999 she had

concluded similarly and more obviously to the point: "He is obese but in no apparent distress."

(R. at 171.)  These opinions support the ALJ's conclusion that Riordan's obesity neither met nor

---

[5]  These sections allude to the effect obesity can have on disorders of the musculoskeletal,
respiratory, and cardiovascular body systems.  *See* SSR 02-1p, 67 Fed. Reg. at 57, 860 ("[W]e
added paragraphs to the prefaces of the musculoskeletal, respiratory, and cardiovascular body
system listings that provide guidance about the potential effects obesity has in causing or
contributing to impairments in those body systems. See listings sections 1.00Q, 3.00I, and 4.00F.
The paragraphs state that we consider obesity to be a medically determinable impairment and
remind adjudicators to consider its effects when evaluating disability . . . .").

medically equaled any listed impairment, nor did it impact any of his other ailments to the point where they met or medically equaled any listed impairment.  Also, Dr. Pollack, while noting Riordan's obesity in 2003, reported that he appeared on physical examination "to be well-developed, well-nourished in no acute distress."  (R. at 218-19.)  Although the ALJ's opinion is clear that the ALJ expressly considered Riordan's obesity in his analysis, *see, e.g.,* R. 20 ("I have fully considered obesity in the context of the overall record in making this decision"), the Court notes that the ALJ's review of and reliance upon the medical reports by Dr. Lefkowitz and Dr. Pollack qualifies as sufficient consideration of Riordan's obesity.  *See Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) (finding that because the plaintiff's doctors were aware of her obesity, "the ALJ's adoption of their conclusions constituted a satisfactory if indirect consideration of that condition.")

Within his challenge to the ALJ's evaluation of obesity, Riordan asserts that his problems with walking and standing caused by his obesity are equivalent to Listing 1.02A (Major dysfunction of a major weight-bearing joint).  The medical evidence, however, does not support this assertion.  First, Listing 1.02A requires the plaintiff to have "chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s)."  20 C.F.R. pt. 404, subpt. P, § 1.02A.  However, Dr. Lefkowitz's examination in 1999 revealed that Riordan denied any joint pain.  (R. at 170.)  Dr. Pollack found Riordan's joints to have "no obvious deformity" with "full range of motion."  (R. at 219.)  Furthermore, Listing 1.02A requires that the dysfunction of the weight-bearing joint result in an inability to ambulate effectively, as defined in section 1.00B2b.  According to medical records, however, Riordan retained a normal gait and could move and ambulate without difficulty.  (R. at 218.)  Indeed, even the non-medical

evidence supports this conclusion.  The SSA employee who conducted a face-to-face interview

with Riordan observed that he had no difficulty sitting, standing, or walking.  (R. at 57-58.)  The

Court finds that Riordan's obesity did not affect his impairments such that they met or medically

equaled Listing 1.02A.

### C.  The ALJ's Determination of Riordan's Residual Functional Capacity

The Court rejects Riordan's argument that the ALJ did not articulate an evidentiary basis

for his RFC determination.  In his decision, the ALJ sufficiently detailed why he determined that

Riordan retained the RFC to engage in sedentary work.  Specifically, he cited the medical

opinions of two physicians, Dr. Lefkowitz and Dr. Pollack, who had treated and examined

Riordan recently before the hearing.  (R. at 20-21.)  He also considered Riordan's symptoms,

including pain, and the extent to which they could reasonably be accepted as consistent with the

objective medical evidence and other evidence, based on the requirements of 20 C.F.R. §§

404.1529 and 416.929, and SSR 96-7p.  (R. at 20.)  He gave "great weight" to the reports of Dr.

Lefkowitz and Dr. Pollack and found that Riordan's statements concerning his impairments and

their impact on his ability to work were "not entirely credible."  (R. at 21.)  It follows that

Riordan's statements could not reasonably be accepted as consistent with the objective medical

evidence or the opinions of Dr. Lefkowitz and Dr. Pollack.

Illustrative of this disconnect is the inconsistent characterization of the effect of Riordan's

obesity on his functional capacity.  Without citing to a single item of evidence in the record,

Riordan asserts that his obesity "in and of itself" reduces his RFC to less than sedentary work.

(Pl.'s Br. 15-16.)  The Court notes that the Third Circuit has criticized such speculative

arguments.  *Rutherford*, 399 F.3d at 553 (finding that by not specifying how obesity impaired the

plaintiff's ability to work, the plaintiff failed to produce enough evidence to support remand).

Furthermore, the opinions of Dr. Lefkowitz and Dr. Pollack contradict such a characterization.

Dr. Lefkowitz reported unequivocally that Riordan was in no apparent distress despite his

obesity.  (R. at 171, 216.)  She concluded that, secondary to mild proteinuria and mildly impaired

creatinine clearance, he would have no functional impairment.  (R. at 171.)  Dr. Pollack

concluded similarly, acknowledging Riordan's obesity while still determining that he was "well-

developed, well-nourished and in no acute distress."  (R. at 218-19.)

     The record reflects other such inconsistencies.  While Riordan asserts, for example, that

he suffers from fatigue and an inability to work a full workday (Pl.'s Br. 25), Riordan stated to

Dr. Lefkowitz that he felt well, and she also reported that Riordan slept fine and had good

energy.  (R. at 170.)  He states that his sleep apnea contributes to his fatigue, but the most recent

sleep study showed that Riordan responded well to CPAP therapy.  (R. at 250.)  Though Riordan

complains of shortness of breath (Pl.'s Br. 25), he had good breath sounds (R. at 174, 207, 216),

his lungs were clear on physical examination (R. at 105-06, 111-12, 126, 128-31, 149-53, 171,

207, 218), he exhibited no rales, wheezing, or rhonchi (R. at 174, 207, 218), and he himself had

previously denied having shortness of breath on multiple occasions (R. at 106, 126-27, 129, 131,

194).

     Regarding Riordan's assertions of pain and its effect on his RFC, the Court first notes that

such subjective complaints must always be evaluated in light of the available objective medical

evidence.  20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).  The objective medical evidence,

however, suggests that Riordan's assertions of pain did not sufficiently satisfy the requirements

for disability:  Riordan acknowledged that, although x-rays were taken, he was never specifically

21

diagnosed with any condition that would cause the back problems he complained of (R. at 280),
he denied having any on-going chest pain (R. at 124, 170, 194) or joint pain (R. at 170), and the
need to elevate his legs and lie down to alleviate pain is corroborated by no medical opinion in
the record as being a medically determinable need.  Furthermore, the ALJ concluded that Riordan
could only engage in sedentary work, which demonstrates a determination by the ALJ that he
accepted Riordan's assertions to an extent that accommodated Riordan's subjective complaints
of pain.  This restriction on Riordan's ability to work by the ALJ gives conclusive effect to
Riordan's complaints.  *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

By definition, sedentary work involves lifting no more than 10 pounds at a time and
occasionally lifting or carrying articles like docket files, ledgers, and small tools, and primarily
involves sitting with occasional standing and walking.  20 C.F.R. §§ 404.1567(a), 416.967(a).  In
addition to the above mentioned factors that mitigate, accommodate, or contradict Riordan's
complaints of obesity, fatigue, shortness of breath, and pain, the substantial evidence supports the
ALJ's determination that Riordan could perform such work.  Riordan testified that he could lift
objects like a gallon jug full of water.  (R. at 286.)  His examinations by Dr. Lefkowitz and Dr.
Pollack show him to have been in no apparent distress and able to move about without difficulty.
(R. at 170, 216, 218.)  Finally, the ALJ's decision was consistent with the RFC assessment made
by reviewing medical consultant, J. R. Michel, M.D., who found that Riordan's exertional
limitations consisted of occasionally lifting no more than 20 pounds, frequently lifting no more
than 10 pounds, being able to sit for about six hours in an eight-hour workday, and an unlimited
ability to push and/or pull.  (R. at 226-32.)  Therefore, the substantial evidence supports the
ALJ's RFC determination.

**V.  CONCLUSION**

For the foregoing reasons, the Court concludes that substantial evidence supports the

ALJ's decision denying Riordan's request for DIB and SSI benefits, and thus affirms the

Commissioner's ultimate decision.  An appropriate order accompanies this opinion.


_____    /s/ Joel A. Pisano
                                                 JOEL A. PISANO, U.S.D.J.
Date: June 29, 2007

23